FILED

04 MAR 30 PM I

U.S. ........
N D OF ALABAM

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | |
|---|---|
| D.C. BEHEL; GENE R. BENDALL; JAMES R. BERRY; HAL BRAY; G.W. GERMAN; RUTH GOLDEN; TRUMAN HALLMARK; WILLIAM A. HAMILTON; CHARLES D. HARVEY; CAROLINE S. JAMES; JERRY F. MITCHELL; BARRIE L. PUTNAM; BILLY R. QUESENBERRY; ROY W. ROBERT, JR.; JUDY ROBINSON; PAT L. SCOTT; STEVEN R. STANLEY; JOHN A. STRINGFELLOW; JAMES P. TAYS,<br><br>    Plaintiffs,<br><br>    vs.<br><br>REYNOLDS METALS COMPANY; REYNOLDS METALS COMPANY NEW RETIREMENT PROGRAM FOR SALARIED EMPLOYEES; REYNOLDS METALS COMPANY TERMINATION ALLOWANCE POLICY,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  CV 01-B-2889-NW<br>)<br>)<br>)<br>)<br>)  **ENTERED**<br>)<br>)  MAR 3 0 2004<br>)<br>)<br>) |

**MEMORANDUM OPINION**

This case is presently before the court on defendants' Motion for Summary Judgment, (doc. 31),[1] and plaintiffs' Motion to Strike, (doc. 40). For the reasons set forth below, plaintiffs' Motion to Strike is due to be granted, and defendants' Motion for Summary Judgment is due to be granted.

---

[1]Reference to document number, ["Doc."], refers to the number assigned to each document filed in the court's record.



## I. <u>MOTION TO STRIKE</u>

Plaintiffs have filed a Motion to Strike, (doc. 40), asking the court to strike the Supplemental Affidavit of Irene L. Jacobson. Plaintiffs contend that the affidavit is due to be stricken on the ground that it was submitted with defendants' Reply Submission.[2]

The court's Appendix A to the Summary Judgment Scheduling Order states, "The moving party shall file ***all*** evidentiary materials . . . with the clerk simultaneously with the motion for summary judgment." (Doc. 11, Ex. A at 1 (emphasis added).) The reason for the rule requiring the moving party to submit all its evidence with its motion is obvious – the non-moving party must be allowed at least "a reasonable and meaningful opportunity to challenge a motion for summary judgment." *Burns v. Gadsden State Community College*, 908 F.2d 1512, 1516 (11th Cir. 1990)(citing, *inter alia*, *Winbourne v. Eastern Air Lines, Inc.*, 632 F.2d 219 (2d Cir. 1980)("purpose of Rule 56(c) is to permit nonmoving party a meaningful opportunity to challenge motion for summary judgment")).

> Recognizing the importance of giving the nonmovant a meaningful opportunity to respond to a motion for summary judgment, this circuit has strictly enforced the requirement of a 10 day advance notice that the court will take a motion for summary judgment under advisement as of a certain date. . . . The reasons for such a requirement are premised on the fact that disposition of a case on summary judgment grounds represents a final adjudication on the merits. It forecloses subsequent litigation on the matter; it is accordingly important that proper notice be given so as to insure "opportunity to present every factual and legal argument available.

---

[2]Plaintiffs did not file a motion asking the court to strike defendants' Supplemental Evidentiary Materials Submitted in Support of Motion for Summary Judgment, (doc. 39). This document contains two exhibits: Exhibit A, excerpts from the deposition of plaintiff Charles D. Harvey, and Exhibit B, Retirement Profile of B.N. Wilson. (*Id.*) Because plaintiffs did not move to strike these exhibits the court will consider them is deciding defendants' Motion for Summary Judgment.

*Id.* (internal quotations and citations omitted).

When faced with additional evidence submitted by the moving party after the time set for the non-moving party to file all its evidence in opposition to the motion, the court has two options: "it [can] strike the [evidence] or grant . . . the nonmoving party the opportunity to respond to it." *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 410 (1st Cir. 1985); *see Beaird v. Seagate Technology, Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998)("Appellants contend that the district court had no 'permissible choice' but to allow a surreply once it had accepted the materials in Seagate's reply. That contention is incorrect. Having accepted the reply brief, the district court in fact had two permissible courses of action. It could either have permitted a surreply or, in granting summary judgment for the movant, it could have refrained from relying on any new material contained in the reply brief."). In this case, the court will to strike the evidence.

The court is striking the Jacobson affidavit because plaintiffs were not given an opportunity by the court to submit evidence or argument in opposition to defendants' Supplemental Evidentiary Materials. However, the court agrees with defendants' argument in response to plaintiffs' Motion to Strike that the information in paragraphs 11 - 13[3] of Ms. Jacobson's supplemental affidavit is responsive to unanticipated matters in plaintiffs' opposition. Document 38, defendants' Supplemental Affidavit of Irene Jacobson in Support

---

[3]Paragraphs 1 - 9 of Ms. Jacobson's supplemental affidavit are essentially repetitious of information in her original affidavit. Defendants do not object to the Motion to Strike paragraph 10.

of Defendants' Motion for Summary Judgment, will be stricken from the record and has not been considered by the court in deciding defendants' Motion for Summary Judgment.

## II. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every

inference but only of every **reasonable** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III. STATEMENT OF UNDISPUTED FACTS[4]

#### A. RESTRUCTURING OF REYNOLDS METALS COMPANY

Reynolds Metals Company [RMC] began a corporate restructuring process in the 1997, "the goal of which was to divest itself of several facilities throughout the country." *Reynolds Metals Company v. Hill*, 825 So. 2d 100, 102 (Ala. 2002). Between March 1997 and January 2000, RMC sold approximately 16 facilities as part of the restructuring process. (Doc. 33 ¶ 9.) In fact, by 2000, RMC was a wholly-owned subsidiary of Alcoa, Inc. (*Id.*)

RMC began the restructuring process because of a change in economics in the metal industry and a shift in its corporate strategic development. (Doc. 32 ¶ 6; doc. 33 ¶ 8.) RMC made a strategic decision to sell its Alloys Can Sheet Facility [hereinafter the Alloys Facility] in Alabama. (Doc. 32 ¶ 8.) RMC had decided to focus its corporate resources on raw materials, transportation and distribution, and packaging and printing; all of which were activities that were not conducted at the Alloys Facility. (*Id.*)

#### B. THE SALE OF THE ALLOYS FACILITY

RMC sold the Alloys Facility to Wise Metals Company, on March 31, 1999. (*Id.* ¶ 10.) The closing date was originally set to occur in December 1998; however, several issues had not been resolved by that date (including various environmental, financial, and hourly-

---

[4]Plaintiffs adopted the facts as set forth in Defendants' Brief in Support of Motion for Summary Judgment. (Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J., p. 2; Defs.' Br. in Supp. of Mot. for Summ. J., 1-9.) Therefore, to the extent supported by the record, the facts set forth herein are the facts set forth in defendants' brief and adopted by plaintiffs.

labor issues). (*Id.* ¶ 10 n.1; doc. 34 ¶ 5.) In fact, the March 31, 1999, date was the fifth date set for the final closing. (Doc. 32 ¶ 11.) Significantly, both RMC and Wise acknowledge that the selection of the final closing date had absolutely nothing to do with employee benefits. (*Id.* ¶ 12; doc. 34 ¶ 9; doc. 31, Ex. 2 at 60-62.)

## C. THE SALARIED WORKFORCE IS EMPLOYED BY WISE

As part of the sale, RMC and Wise negotiated a clause in the sales agreement, which stated that Wise "may offer employment to all or a portion of the Unrepresented Employees [salaried workers] and shall offer them such compensation and benefits as [Wise] may determine to be appropriate and competitive." (Doc. 31, Ex. 3 § 9.2(a).) Consequently, the majority of the approximately 300 salaried workers at the Alloys Facility, and each of the plaintiffs in this action, were offered and accepted employment with Wise. (Doc. 33 ¶ 11.)[5] At the close of business on March 31, 1999, RMC terminated Alloys Facility salaried workers; the following morning, April 1, 1999, the salaried workers retained by Wise continued to do their specified jobs. *Reynolds*, 825 So. 2d at 103.

While the majority of the RMC salaried workforce received employment offers from Wise, approximately twenty salaried workers were not offered jobs with Wise. (Doc. 33 ¶12; doc. 34 ¶ 11.) Because Wise was buying the Alloys Facility as a going concern, it determined that it needed a few of the former RMC salaried workers that had not been

---

[5]*See also* doc. 16 Ex. 1 at 21 (James); Ex. 2 at 21 (Mitchell); Ex. 4 at 68-70 (Bendall); Ex. 5 at 23 (Berry); Ex. 6 at 25 (Bray); Ex. 7 at 15-16 (German); Ex. 8 at 24-25 (Golden); Ex. 9 at 24 (Hallmark); Ex. 10 at 11 (Hamilton); Ex. 11 at 35 (Harvey); Ex. 12 at 15 (Putnam); Ex. 13 at 13, 27, 33 (Quesenberry); Ex. 14 at 32-33 (Roberts); Ex. 15 at 17 (Robinson); Ex. 16 at 15 (Stanley); Ex. 17 at 20-21 (Stringfellow); Ex. 18 at 13 (Tays).

6

offered employment with Wise to work as transitional workers to ensure a smooth transition. (Doc. 32 ¶ 13.) Thus, during the sale negotiations with RMC, Wise prepared a list of former RMC salaried workers that had not been offered full-time employment with Wise, which it wished to utilize as transitional workers through an outside contracting service. (Doc. 34 ¶ 12; doc. 32 ¶ 14.) These transitional workers were Charlie Wilson, Cecil Campbell, Eugene Harris, Martha Maxcey, B.N. Wilson, and Jerry Shaw. (Doc. 31, Ex. 25 at 2.) These transitional workers worked for Wise for varying periods of time. (Doc. 34 ¶ 13.) The selection of the transitional workers was made by Wise; RMC was not involved in that decision. (*Id.* ¶ 14; doc. 32 ¶ 16.)

**D. RELEVANT RMC PLAN DOCUMENTS**

In their Complaint, plaintiffs allege that RMC arranged the sale of the Alloys Facility in such a way as to prevent them from attaining certain pension and welfare benefits under RMC's New Retirement Program [hereinafter "Retirement Plan"]; the Retiree Health Care Plan [hereinafter "RHC Plan"]; the Termination Allowance Policy [hereinafter "TAP"], and the Enhanced Termination Package [hereinafter "ETP"]. (Doc. 1 ¶¶ 4, 6.)

   1.   **Retirement Plan**

RMC's Retirement Plan, an ERISA plan administered and sponsored by RMC, provides lifetime monthly pension benefits to eligible salaried employees upon retirement. (Doc. 31, Ex. 19.) Under the terms of the Retirement Plan, every RMC employee became a plan participant the day he or she completed one year of Retirement Vesting Service.[6] (*Id.*

---

[6] A RMC employee earned one year of vesting service for each 365-day period of service. (Doc. 31, Ex. 19 at 21.)

at 3.) The Retirement Plan defines several types of retirement categories, including Normal Retirement, Delayed Retirement, Early Retirement, and Deferred Vested Retirement.[7] (*Id.* at 4-5, 10.) Only "Early Retirement" is at issue in this case.

An employee is eligible for Early Retirement benefits when he or she: [1] "reach[es] age of 55 and complete[s] 10 years of Retirement Vesting Service; **or** [2] complete[s] 30 years of Retirement Vesting Service, regardless of [his or her] age. (*Id.* at 4.) In this case, fifteen plaintiffs did not qualify for early retirement on the date of the Wise sale.[8] The remaining four plaintiff had 30 years of service on March 31, 1999 and, therefore, qualified for immediate Early Retirement on that date.[9]

### 2. RHC Plan

The RHC plan, which is sponsored and administered by RMC, provides pre-Medicare retirees with the same health care plans as all active employees at the location from which

---

[7]Employees, with at least five years of vesting service, are vested in the Retirement Plan. If such a vested employee should leave RMC and/or its subsidiaries at any time before they are eligible for retirement benefits, his retirement benefit is deferred until he reaches 65, or reaches 55 with ten years of vesting service. (Doc. 31, Ex. 19 at 10.)

[8]Nine plaintiffs were within eighteen months of reaching 55 years old and had 10 years of service: Behel, (doc. 31, Ex. 21 at 30-31, 47-53); Bendall, (*id.*, Ex. 4 at 36, 73-74); Berry, (*id.*, Ex. 5 at 55-58); German, (*id.*, Ex. 7 at 44-46); Golden, (*id.* Ex. 8 at 7, 37, 55-56); Hallmark, (*id.* Ex.9 at 29, 32-33); Hamilton, (*id.*, Ex. 10 at 7, 10-11, 33); James, (*id.*, Ex. 1 at 27-28, 50-52, 55-56); Quesenberry; J. Robinson, (*id.*, Ex. 15 at 14, 20, 36-37). Five plaintiffs were within 18 months of reaching 30 years of service: Bray, (*id.*, Ex. 6 at 47-48, 52-53); Harvey, (*id.*, Ex.11 at 34-35-90-91); Roberts, (*id.*, Ex.14 at 45, 57, 60, 64-65); Stanley, (*id.*, Ex.16 at 31, 43); Stringfellow, (*id.*, Ex.17 at 16-17, 51-52).

[9]The four plaintiffs are Mitchell, (doc. 31, Ex. 2 at 26-29); Putnam, (*id.*, Ex. 12 at 28); Tays (*id.*, Ex. 18 at 52-54); and Scott, (*see* Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J., at 7 n.3.

they retired, except RMC does not provide a dental plan, a vision plan, or a employee assistance program to these retirees. (Doc. 31, Ex. 20 at 5.) In order to be eligible for the retiree health care coverage, a retiree must (1) retire under the Retirement Plan; (2) be covered by RMC's health care plan the day before he or she retired; and (3) meet the 55-10 retirement bar, the 30-year retirement bar, or be 65 years of age with at least 5 years of service. (*Id.* at 6.)

Eligible participants in the RHC Plan may be required to pay a portion of the premiums for health care coverage, depending on their age and years of service. (*Id.* at 9-10.) The RHC plan provides that a qualified participant owes no "Age & Service Premium" if the participant's age plus years of service equal 90 or more. (*Id.* at 9.) This is referred to as the "Rule of 90." (*Id.*) If the total of the retiree's age plus years of service is less than 90, the retiree is required to pay 4 % of the total cost of coverage for each year under 90.[10] (*Id.* at 10.)

Individuals who do not qualify for retirement under the Retirement Plan, or who qualify only for Deferred Vested Retirement, are not eligible to participate in the RHC Plan. (*Id.* at 6.) In this case, fifteen plaintiffs are not eligible to participate in the RHC Plan because they were not eligible to retire on March 31, 1999. The remaining four plaintiffs were eligible to participate in the RHC Plan; however, because they did not meet the Rule of 90, they were required to pay a certain portion of the premium for coverage.

---

[10]For example, if an employee's aggregate age and years of service is 87, the retiree is required to pay 12% (90-87=3; 3 x 4% = 12%) of his yearly health care coverage premium.

9

### 3. TAP and ETP Plans

In addition to the above benefits, RMC's salaried employees were also provided with a Termination Allowance Policy ("TAP"), also an ERISA plan. The intended purpose of TAP was to provide termination or severance pay to salaried employees who meet the eligibility conditions and to provide an economic bridge during possible unemployment. The eligibility requirement in TAP provided that termination allowances were not payable for "employment transfers to a Reynolds Subsidiary or to a *Successor to Reynolds*." (*Id.* at 2 (emphasis in original).)[11]  Further, TAP provides that a salaried worker would not be eligible to receive a termination allowance if that worker was offered and refused employment with a successor. (*Id.*)

In early 1997, during the restructuring process, RMC supplemented TAP with the Salaried Employee Enhanced Termination Package (ETP). The ETP contained the same eligibility requirements as contained in TAP. (Doc. 31, Ex. 24.) Thus, no severance benefits were payable if the salaried employee accepted, or was offered and refused, employment in another position with RMC, a position with a RMC subsidiary, or a position with a successor to RMC, such as Wise. (*Id.* at 2.)

The ETP provides:

If within eighteen months of being eligible for immediate retirement on the effective date of the reduction-in-force, a salaried employee who fulfills performance requirements set by the Company until the effective date of the reduction-in-force and who sign a release will:

---

[11]The term "Successor to Reynolds" is defined as a "a Successor (by purchase, transfer of assets or otherwise) to Reynolds as owner of the facility and/or business unit in which you work." (Doc. 31, Ex. 23 at 2.)

. . .

    2.    be placed on leave of absence for a period of time which will be the longer of (i) the number of months needed to qualify for immediate retirement or (ii) the total number of months of combined termination pay (pay under the regular [TAP] plus enhanced severance pay) for which the employee is eligible. Employees receiving this benefit will be paid their combined termination pay in monthly installments; they will not be paid any termination pay in a lump sum when placed on leave of absence; and

    3.    receive waiver of the Rule of 90, if needed.

(Doc. 31, Ex. 24 at 1.)

### E. PLAINTIFFS' CLAIMS

The individual plaintiffs in this lawsuit breakdown into two categories: fifteen plaintiffs were not eligible for early retirement, but were within 18 months of qualifying for early retirement as of March 31, 1999. These fifteen plaintiffs were offered employment with Wise; therefore, they were not eligible for TAP and/or ETP benefits, including the eighteen-month bridge to early retirement and the waiver of the Rule of 90. The remaining four plaintiffs were eligible for early retirement. However, these plaintiffs were offered employment with Wise; therefore, they were not eligible for a waiver of the Rule of 90. Consequently, these four plaintiff's received early retirement pension benefits, but they pay a portion of the premium for their health care coverage.

While plaintiffs have admitted that according to the plan language they were not entitled to TAP and/or ETP benefits,[12] they claim that RMC arranged the sale of the Alloys Facility to Wise in such a way as to prevent them from obtaining benefits under the various

---

[12]*See* doc. 31, Ex. 1 at 67-69; Ex. 2 at 36-37; Ex. 12 at 18, 22; Ex. 13 at 43-44; Ex. 15 at 23-24; Ex. 16 at 47; Ex. 17 at 33-34.

11

retirement benefits plans. (Doc. 1 ¶ 6.) They further allege that RMC discriminated against them in that they were treated less favorably than other similarly-situated salaried employees that were terminated from RMC, worked for Wise as transitional workers through an outside contracting service, and were allowed to participate under the Retirement Plan and the RHC Plan. (*Id.*) Defendants contend that the decision not to employ the alleged similarly-situated employees, the transitional employees, was made **solely** by Wise; RMC was not involved in that decision. (Doc. 32 ¶ 16; doc. 34 ¶ 14.)

However, plaintiffs have presented evidence that one transitional employee, B.N. Wilson, was selected by RMC employee, Sam Glasscock, to continue performing his job duties at the Alloys Facility on a contract basis and was not offered a job with Wise for the purpose of "protect[ing] his health care benefits and provid[ing] him [with] his pension." (Doc. 36, Ex. C at 28, 29-30.)[13] Wise did not offer Wilson employment after the sale of the

---

[13]Plaintiff Steven Stanley testified:

A.  I was on Sam Glasscock's staff and in a staff meeting, he indicated that Ben was going to be offered the opportunity to work on contract and not be offered a job with Wise to protect his health care benefits and provide him his pension.

. . .

Q.  In the meeting where Sam Glasscock told you about this, did he say he made the decision to do this?

A.  Yes.

Q.  Were there any questions asked about it?

A.  I don't recall any questions. He said the reason he was doing it was that Ben's wife was ill with cancer and he needed to protect her health care

Alloys Facility. (Doc. 32 ¶ 14.) At the time of the sale of the Alloys Facility, Wilson was eligible for early retirement and the Rule of 90 was waived pursuant to ETP provisions. (Doc. 39, Ex. B).

### III. DISCUSSION

Defendants contend that they are entitled to summary judgment on the grounds that (1) § 510 prohibition does not apply to corporate organizational changes, only individual adverse decisions; and (2) that plaintiffs cannot establish that defendants had a specific intent to interfere with their rights to retirement benefits.

Section 510, 29 U.S.C. § 1140, provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . ., or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . .

29 U.S.C. § 1140. "The ultimate inquiry in a § 510 case is whether the employer had the specific intent to interfere with the employee's ERISA rights." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1222 (11th Cir. 1993).

Defendants contend that "a corporate organizational change, such as [RMC's] sale of the Alloys Facility to Wise, is not the type of action that is prohibited by [§ 510]." (Defs.' Br. in Supp. of Mot. for Summ. J., at 11-12 (citing *Andes v. Ford Motor Co.*, 70 F.3d 1332, 1336-38 (D.C. Cir. 1995); *Phillips v. Amoco Oil Co.*, 614 F. Supp. 694, 721-23 (N.D. Ala.

---

benefits, his health care benefits and give him the opportunity to receive his pension.

(Doc. 36, Ex. C at 28-30.)

13

1985), *aff'd* 799 F.2d 1464 (11th Cir. 1986)).) However, because the court finds that plaintiffs' have not established a disputed issue of fact as to whether defendants acted with the specific intent to interfere with their ERISA rights, the court pretermits discussion of the issue of whether an organizational change can form the basis of a § 510 action.

Defendants contend that plaintiffs cannot establish that defendants made any decision affecting their benefits with the specific intent to interfere with their ERISA rights. Plaintiffs are "not required to prove that interference with ERISA rights was the sole reason for the [adverse action] but must show more than the incidental loss of benefits as a result of [an adverse action]." *Clark*, 990 F.2d at 1223. Because plaintiffs do not have direct evidence that defendants acted with a specific intent, plaintiffs' may establish their claims using the "scheme of circumstantial evidence established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as restated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981)." *Id.*

The *Clark* court established the following *prima facie* case for § 510 claims:

> In the context of a § 510 claim alleging unlawful discharge, a plaintiff may establish a prima facie case of discrimination by showing (1) that he is entitled to ERISA's protection, (2) was qualified for the position, and (3) was discharged under circumstances that give rise to an inference of discrimination.

*Id.* at 1223-24. "[A] fundamental prerequisite to a § 510 action is an allegation that [defendant changed] the employer-employee relationship [with plaintiff] in some discriminatory or wrongful way." *Place v. Abbott Laboratories, Inc.*, 938 F. Supp. 1379, 1387 (N.D. Ill. 1996)(citing *Deeming v. American Standard, Inc.*, 905 F.2d 1124, 1127 (7th Cir. 1990)). Also, "measures designed to reduce costs in general that also result in incidental

14

reduction in benefit expenses do not suggest discriminatory intent. Instead, the employee must introduce evidence suggesting that the employer's decision was directed at ERISA rights in particular." *Clark*, 990 F.2d at 1224.

The record indicates that the Alloys Facility was sold for legitimate business reasons and not for the purpose of interfering with employees' ERISA rights. Moreover, the record demonstrates that Wise decided to hire plaintiffs as permanent, as opposed to transitional, employees following its purchase of the Alloys Facility. Because Wise, the successor to RMC, offered plaintiffs employment, plaintiffs were not entitled to TAP and/or ETP retirement benefits.

Plaintiffs claim that they "should have been allowed to receive . . . termination allowances because other similarly situated employees did receive the allowances, and that this is clear evidence of discriminatory intent on the part of [RMC]." (Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J., at 4.) They assert:

> [A]t least six (6) other employees were allowed to continue in their same position of employment with Wise Metals after the sale of the Reynold's facility to Wise Metals. The only difference between these six employees, who received their benefits, and Plaintiffs, who did not, is that these six individuals were allowed to retain their positions as contract employees through an employment agency."

(*Id.* at 4-5.)

As plaintiffs admit, the six comparators were not offered employment by Wise; thus, under the terms of the plans, they were entitled to TAP and/or ETP benefits. With the exception of one comparator, B.N. Wilson, plaintiffs offer no evidence from which the court could infer RMC affected the decision of Wise as to which RMC employees to hire and

which employees to employ as transitional contract employees. Moreover, there is no evidence that RMC's actions were taken in order to adversely affect plaintiffs' retirement benefits.

Defendants contend that all decisions to hire transitional workers were made by Wise. Accepting as true, for purposes of summary judgment only,[14] that Glasscock made the statement about B. N. Wilson, there is evidence on which a factfinder could conclude that as to B. N. Wilson, RMC affected or influenced Wise's decision not to hire him and to hire him as a contract worker. This evidence does not demonstrate that RMC intended to discriminate against plaintiffs with regard to their retirement benefits. At most, one could

---

[14]Defendants argue in their reply brief that the testimony of Steve Stanley regarding the alleged statement of Sam Glasscock pertaining to Wilson's retention as a contract worker is inadmissible hearsay. They argue:

> In this case, there is no evidence in the record establishing that [Glasscock] was authorized to make such a statement by the Company. *See* Fed. R. Evid. 801[(d)](2). Without such foundation evidence, this hearsay statement does not contain the required level of trustworthiness for admissibility.

(Def. Reply Br. at 8 n.8.) Plaintiff contends that Glasscock's statement was an admission. (Pl. Br. in Opp. to Mot. for Summ. J. at 9.) The court agrees.

"The general is that inadmissible hearsay cannot be considered on a motion for summary judgment." (*Macuba v. Deboer*, 193 F3d 1316, 1323 (11th Cir. 1999). However, Stanley's testimony is not hearsay. Stanley testified that Glasscock was his supervisor when he was employed by Reynolds; Glasscock made the statement at issue during a staff meeting; Glasscock said "that Ben was going to be offered the opportunity to work on contract and not be offered a job with Wise to protect his health care benefits;" Glasscock said that he had made the decision to retain Ben Wilson. (Doc 42, Ex. C at 28-29.) Rule 801(d)(2) provides that a statement is not hearsay if "[t]he statement is offered against a party and is . . . (D) a statement by the party's agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(D). Glasscock's alleged statements fit within this exception to the hearsay rule; therefore, Glasscock's statements to Stanley are admissible as an admission of Reynolds.

16

infer that RMC (or Stan Glasscock) wanted to assist Wilson because his wife was gravely ill.[15]

The Supreme Court has held, "Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, ***no rational factfinder could conclude that the action was discriminatory***. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision . . . ." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) (emphasis added). Absolutely nothing in the record demonstrates that RMC hired Wilson as a contract employee or affected Wise's decision not to hire him for any reason other than to help Wilson because his wife was gravely ill. Certainly, the evidence does not suggest that RMC sold the Alloys Facility or terminated plaintiffs with the intent to discriminate against plaintiffs with regard to the retirement benefits.

Therefore, the court finds that plaintiffs have not demonstrated that RMC took any adverse action against them with the specific intention of denying them TAP or ETP benefits. RMC sold the Alloys facility where plaintiffs worked and plaintiffs were hired by Wise after the sale. The fact that RMC did not see that plaintiffs were hired to work for Wise on a

---

[15]Defendants note in their reply brief that Mr. Glasscock's statement "makes no sense in the context of this litigation because as of March 31, 1999 (the sale date to Wise), B.N. Wilson qualified for immediate Early Retirement, which entitled him to lifetime retiree healthcare coverage." (Defendant's Reply Brief at p. 9) (citations to evidence omitted). Thus, "Wilson would have qualified for Reynolds lifetime coverage regardless of whether or not he had received a job offer from Wise (or was offered a position with Wise as a transitional worker)." *Id.*

contract basis, as Wilson was, is not evidence that RMC changed its relationship with plaintiffs in "some discriminatory or wrongful way" with the specific intent of depriving them of an ERISA benefit. Therefore, the court finds that plaintiffs have not established a prima facie case of discrimination in violation of section 510, and defendants' Motion for Summary Judgment is due to be granted.

## CONCLUSION

For all of the foregoing reasons, the court is of the opinion that plaintiffs' Motion to Strike the Supplemental Affidavit of Jacobson, (doc. 40), is due to be granted. The court has not considered this supplemental affidavit in deciding the Motion for Summary Judgment. Also, the court finds there are no material facts in dispute and defendants are entitled to judgment as a matter of law on plaintiffs' claims. Therefore, defendants' Motion for Summary Judgment, (doc. 31), is due to be granted. An order granting plaintiffs' Motion to Strike and defendants' Motion for Summary Judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 29th day of March, 2004.

*Sharon Lovelace Blackburn*
SHARON LOVELACE BLACKBURN
United States District Judge